## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BLACKHAWK CONSULTING, LLC**                  :
2465 Centreville Rd., #J17-108                      :
Herndon, Virginia  20171                             :
                                                                  :
            Plaintiff,                              :
                                                                  :
v.                                                               :        Civil Action No.
                                                                  :
**FEDERAL NATIONAL MORTGAGE**        :
**ASSOCIATION**                                        :
3900 Wisconsin Ave., NW                            :
Washington, D.C.  20016                             :
                                                                  :
            Defendant.                            :

## COMPLAINT

Blackhawk Consulting, LLC ("Blackhawk" or "Plaintiff"), by and through undersigned

counsel, hereby sues the Federal National Mortgage Association ("Fannie Mae" or "Defendant")

for defamation (libel and slander), tortious interference with existing business contracts, tortious

interference with prospective business opportunities, unjust enrichment, promissory estoppel,

quantum meruit, statutory business conspiracy, and common law civil conspiracy.  In support of

this Complaint, the Plaintiff alleges the following:

### Jurisdiction and Venue

1.     Jurisdiction is present pursuant to 28 U.S.C. § 1332, as there is diversity of

citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.     Fannie Mae is deemed a citizen of the District of Columbia for purposes of

jurisdiction and venue in civil cases.  12 U.S.C. § 1717(a) (2) (B).  Venue is also proper in this

District pursuant to 28 U.S.C. §§ 1301(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of

the events and/or omissions giving rise to the claims emanated from activities within this

District, and the Defendant conducts substantial business in this District.  Fannie Mae has its primary place of business in this District.

3.     Plaintiff is a Virginia limited liability company with its principal place of business in Virginia at the address listed above.

4.     Jurisdiction in this Court also arises pursuant to 12 U.S.C. § 1723a(a), which authorizes suit against Fannie Mae "in any court of competent jurisdiction, State or Federal."

**Parties**

5.     Blackhawk is a consulting firm with offices in Virginia, Florida, Georgia, California, Illinois, Texas and the District of Columbia.  It provides services primarily in the residential real estate market.

6.     Defendant Fannie Mae was originally chartered by Congress as a government-sponsored enterprise ("GSE") in order to expand the secondary market for mortgages in the United States.  Fannie Mae purchased mortgages on the secondary market, pooled them, and then re-sold the mortgages as mortgage-backed securities to investors on the open market.  Fannie Mae was privatized in or about 1968.

7.     Fannie Mae is a corporate enterprise with a stated mission of providing liquidity, stability and affordability to the U.S. housing and mortgage markets.

8.     On September 7, 2008, the director of the Federal Housing Finance Agency ("FHFA") announced that Fannie Mae had been placed under the conservatorship of the FHFA.

## General Allegations

## Introduction

9.     This case relates to Fannie Mae's intentional actions to defame, damage, and tortiously interfere with the legitimate business activities of Plaintiff.

10.     In or about November of 2012, Fannie Mae terminated contracts with numerous real estate brokers "without cause" because these brokers did business with Plaintiff.

11.     Fannie Mae withdrew more than six hundred (600) assigned properties from the terminated brokers.  By reassigning these properties, Fannie Mae stripping the terminated brokers and Plaintiff of compensation for services rendered.

12.     Blackhawk was providing valuable services to Fannie Mae's real estate brokers at no additional expense to Fannie Mae.  Blackhawk was enhancing and improving the work of Fannie Mae's brokers for the benefit of Fannie Mae and the United States taxpayer.

13.     Fannie Mae disseminated false and disparaging information about the Plaintiff throughout the real estate industry.

14.     Fannie Mae has falsely claimed that Blackhawk's activities are somehow inconsistent with Fannie's Mae's "business model," in part because brokers were outsourcing certain administrative and other tasks to Blackhawk and were borrowing money from Blackhawk.

15.     For improper purpose and with malicious intent, Fannie Mae sought to damage Plaintiff and to eliminate all business opportunities for the Plaintiff.

16.     Fannie Mae's conduct is tortious, wrongful, and without justification.

- 3 -

**Fannie Mae**

17.     Fannie Mae operates in the U.S. secondary mortgage market.  The current mortgage and real estate crisis has resulted in a substantial number of foreclosures in the residential real estate market throughout the United States.

18.     When loans default, Fannie Mae acquires homes through foreclosure sales and deeds-in-lieu of foreclosure sales.  When Fannie Mae takes title, the properties enter the real estate owned (REO) status.

19.     Fannie Mae endeavors to sell REO homes with the assistance of real estate brokers through the United States.

20.     Fannie Mae's primary objectives in this field of operations are (a) to minimize the severity of loss to Fannie Mae by maximizing sales prices and (b) to stabilize neighborhoods by preventing empty homes from depressing home values.

**Brokers for Fannie Mae**

21.     Fannie Mae contracts with specific brokers in connection with its extensive REO inventory of properties.

22.     Fannie Mae is authorized to enter into and perform contracts pursuant to 12 U.S.C. § 1723a(a).

23.     According to Fannie Mae's published Code of Conduct, it purportedly treats customers, vendors, competitors and regulators "respectfully, honestly, and in a straightforward manner."  Fannie Mae does not abide by its own Code of Conduct.

24.     Fannie Mae enters into a written "Master Listing Agreement" with each broker (hereinafter "Master Agreement").

25.     In the Master Agreement, Fannie Mae promises compensation to brokers for their work on REO properties.

26.     The Master Agreement recognizes that brokers may use persons and firms, including "Broker Personnel" in connection with the services rendered pursuant to the Master Agreement.

27.     In the Master Agreement, "Broker Personnel" is defined as "the Broker, whether or not such party is an individual or business entity, and the employees, independent contractors and Subcontractors of Broker."

28.     The Master Agreement does not prohibit brokers from hiring independent contractors or utilizing an administrative office to service multiple brokers.

29.     The Master Agreement does not identify the minimum or necessary qualifications of Broker Personnel.

30.     The Master Agreement does not prohibit brokers from borrowing money from third parties.

31.     The Master Agreement expressly authorizes each broker to delegate authority to listing agents who work on that broker's behalf.

32.     Upon information and belief, Fannie Mae routinely permits the outsourcing of services by its real estate brokers.

33.     Upon information and belief, Fannie Mae routinely allows brokers to share administrative staff with other brokers in order to create greater efficiencies. Many REO brokers have multiple offices that share resources and personnel. Upon information and belief, Long & Foster, RLA, and Windermere have branch offices with overlapping or centralized administrative functions. Upon information and belief, Fannie Mae has not terminated brokers from these established real estate companies simply because of their business model or administrative staffing practices.

34.     Upon information and belief, Fannie Mae does not normally investigate or regulate the Broker Personnel who are hired by real estate brokers to perform the myriad of tasks required by Fannie Mae. Fannie Mae does not prohibit all REO brokers from having multiple offices or hiring independent contractors.

35.     In this case, Fannie Mae fabricated a bogus rationale for terminating certain brokers.

36.     Fannie Mae issues an "REO Sales Guide" that purportedly describes the REO process in greater detail than the Master Agreement. In or about 2012, the REO Sales Guide was more than 350 pages in length.

37.     Fannie Mae requires REO brokers to perform many tasks that exceed the customary roles of a listing agent. REO brokers manage and market properties for Fannie Mae.

38.     REO brokers are required by Fannie Mae to assist in the valuation of properties, provide local market advice and expertise, make occupancy determinations, conduct property inspections on a regular basis, supervise efforts to rehabilitate the many properties that are not

ready for sale, supervise the efforts of preservation vendors, change the utility accounts and pay utility and preservation bills on behalf of Fannie Mae, interact with tenants, seek to address environmental and mold issues, pay liens, correct jurisdictional fines and assessments, list the properties for sale, assist title companies with complex title issues, participate in the sales contract process, attend settlements, and provide post-closing representation.

39.     Fannie Mae assigns particular properties to real estate brokers by and through the transmission of a request for a "broker price opinion" ("BPO").

40.     In the REO Sales Guide and other written communications, Fannie Mae claims to make property assignment decisions by balancing inventory among all active brokers while considering individual broker performance, proximity, capacity, experience, diversity and qualifications. The Guide states:  "When assigning a broker, the strategy is to choose a qualified broker with a proven track record of acceptable performance."  Upon information and belief, Fannie Mae does not consistently follow these standards or procedures.

41.     In the REO Sales Guide, Fannie Mae claims that favorable performance by brokers may result in additional inventory opportunities for those brokers.  Upon information and belief, Fannie Mae selectively applies this assignment criteria.

42.     In the REO Sales Guide, Fannie Mae claims that it "values strong relationships with its suppliers…"  This statement in the REO Sales Guide is false.

43.    The REO Sales Guide claims that Fannie Mae Sales Representatives select brokers from Fannie Mae's broker network to assist them with managing and selling the properties. The Guide states that "the Fannie Mae Sales Representative or AMP Asset Manager makes the initial REO property assignments."

44.    Fannie Mae repeatedly violated the REO Sales Guide with respect to the brokers for whom Blackhawk provided services.  In part, Fannie Mae abandoned its normal assignment procedures, disregarded performance-based standards for property assignments, and threatened Sales Representatives with adverse personnel actions if they assigned properties in accordance with the published practices.

45.    Brokers perform most of their services on Fannie Mae's REO properties before such properties are actually listed for sale.

46.    Before each property is listed, the assigned brokers typically incur expenses and perform services for the benefit of the property and Fannie Mae. Generally, the broker pays the utility bills, certain repair bills, expenses for "Title 5" inspections, "cash-for-keys" payments, and many other expenses, and then files for Fannie Mae reimbursement by submitting a Cash Disbursement Request Form 571.

47.    Fannie Mae implements an REO property repair process for its properties that often requires the assigned broker to recommend repairs, select companies to perform the repairs – often through a bidding process, manage the repairs, pay for certain repairs and then submit for expense reimbursement.

48.     When a property is ready for listing and sale, Fannie Mae usually issues a listing supplement that provides a broker with an exclusive right to list the property.

49.     Fannie Mae routinely and regularly issues the listing supplement for a property to the broker who had previously received the BPO for that particular property.

50.     REO brokers expect compensation for their services and are promised compensation by Fannie Mae.

51.     In the normal course of business, the broker receives compensation from Fannie Mae when the listed property is sold.  Such compensation relates to all services that were performed by that broker, including the many services performed in the BPO-phase and the listing phase.

52.     According to the REO Sales Guide, Fannie Mae provides feedback to brokers regarding their performance, including monthly scorecards and quarterly report cards.  Fannie Mae claims to provide brokers with coaching, opportunities for remediation and probation. Fannie Mae does not apply these practices in a consistent manner.  Some brokers are provided with opportunities for remediation after engaging in significant transgressions, while others are terminated for petty or non-existent offenses.

### Termination of the Brokers

53.     Commencing in or about October of 2012, Fannie Mae suddenly suspended a substantial numbers of brokers who were actively servicing hundreds or more of Fannie Mae's properties.  Once suspended, these brokers were no longer assigned new properties.  The affected brokers were not advised of these suspensions.

54.     In or about November and December of 2012, these suspended brokers were terminated by Fannie Mae.  They had an inventory of more than six hundred (600) assigned properties from Fannie Mae at the time of termination.

55.     The terminated brokers include, but are not limited to the following: Janet Hegseth – KW Eastside Partners; Vinda Milless – Bitterroot Real Estate; Alice Santos – Keller Williams Capital Partners; and Patricia Shampney – Keller Williams.

56.     Upon information and belief, the brokers were all terminated "without cause."

57.     Many of the brokers were told in telephone calls from Fannie Mae that they were terminated because of their usage of consulting firms.

58.     Upon information and belief, at or about the time of each termination, Fannie Mae withdrew all BPO assignments and all actively listed properties from the terminated brokers.

59.     With limited exception, Fannie Mae refused to compensate the brokers for the work associated with properties that were not under contract at the time of termination.

60.     Upon information and belief, many of the terminated brokers had received exemplary performance reviews from Fannie Mae before termination.  The terminated brokers were some of the best REO brokers in the Fannie Mae network.

61.     Upon information and belief, Fannie Mae has wrongfully withheld compensation from the terminated brokers. They were not paid commissions for most of their assigned properties, despite the work performed by the brokers and Blackhawk relating to those properties.

62.     Fannie Mae has engaged in improper and unfair business practices with respect to its REO brokers and Blackhawk.  Fannie Mae has pursued a wrongful pattern of behavior that is inconsistent with Fannie Mae's obligations to its brokers, governmental authorities, the U.S. taxpayers, and the Plaintiff.

63.     Fannie Mae has not followed the letter or spirit of the REO Sales Guide by terminating high performing brokers and withholding assignments from them.  Fannie Mae applies different and stricter standards to targeted brokers and agents who are about to be terminated.  Fannie Mae uses the REO Sales Guide as a selective weapon to destroy and discriminate against particular brokers without just cause.

64.     Upon information and belief, Fannie Mae's broad pattern of conduct cannot be justified or explained by the acts or omissions of the terminated brokers.

65.     Fannie Mae asserts in a letter, dated November 9, 2012, that these brokers were treated adversely because it does not "support a model" in which REO brokers outsource certain "back-office support."

66.     Fannie Mae's attorneys stated on November 6, 2012, that the usage of Blackhawk was not consistent with Fannie Mae's business model.  According to Fannie Mae's lawyers, they were "not comfortable with" Blackhawk's involvement with the brokers.

67.     Fannie Mae has refused to disclose which services may be outsourced by REO brokers and which are allegedly "critical functions" that may not be outsourced.

68.     Upon information and belief, Fannie Mae cannot articulate such critical functions because Fannie Mae does not, in fact, prohibit the outsourcing of services by all brokers. It has created a new, unwritten policy that applies only to selected brokers.

69.     Fannie Mae does not routinely or consistently investigate or restrict a broker's usage of independent contractors to perform administrative and secretarial duties.

70.     Fannie Mae does not routinely or consistently investigate or restrict a broker's ability to borrow money from third parties to pay for operational expenses or costs associated with the management of REO properties.

71.     Fannie Mae does not routinely or consistently require new brokers to disclose the manner in which they will staff their REO operations or finance them.

72.     For an improper purpose, Fannie Mae is applying different, more restrictive, standards of conduct to certain brokers.

73.     Fannie Mae has admitted that these outsourced services by Blackhawk "may be of value to these brokerage firms" and that Blackhawk's support is provided by "experienced personnel."

74.     Fannie Mae has never communicated any concerns about the quality or qualifications of those providing outsourced services to REO brokers. Fannie Mae has never communicated any concerns about the performance of the terminated brokers or the effectiveness and/or quality of their services.

75.     Fannie Mae's stated rationale for terminating these brokers is, upon information, untrue, false and improper.

76.    The REO brokers were never advised of Fannie Mae's alleged outsourcing policy before termination.

77.    The brokers were not provided with any opportunity to cure the practices that purportedly violated Fannie Mae's vaguely articulated business model.

78.    Upon information and belief, the brokers were terminated in order to damage the company that provides support services to Fannie Mae's REO brokers, specifically Blackhawk Consulting, LLC.

79.    An owner of Blackhawk, Jonathan Spinetto, is also an owner of two established real estate brokerage firms, Champion Homes Realty and Redline Realty.  Those two brokerage companies sold over Two Thousand Two Hundred (2,200) REO properties for Fannie Mae between 2008 and December of 2012.  They were summarily terminated by Fannie Mae in or about November of 2012 "without cause" because of their informal affiliation with Blackhawk.

### Blackhawk Consulting, LLC

80.    Blackhawk Consulting, LLC is a minority owned company.  It is owned and managed by Jonathan Spinetto ("Spinetto").  He is of Hispanic origin.  In or before 2012, many Fannie Mae personnel knew that the principal of Blackhawk is Hispanic.

81.    Blackhawk was formed in 2011 in response to stated concerns of Fannie Mae's REO asset managers that REO brokers were having difficulty finding an efficient means to comply with Fannie Mae's many administrative requirements.  These administrative requirements include, but are not limited to, substantial advanced expenses, short time frames for performance, and cumbersome reimbursement procedures.

82.     In or about 2010 and 2011, Fannie Mae personnel actively encouraged Spinetto to expand his REO operations because Fannie Mae needed more qualified and capable brokers.  On June 7, 2011, Spinetto met with David Box, a Vice President and Director of REO Sales at Fannie Mae, to discuss among other things the concept of third-party support for brokers. Mr. Box did not express reservations about the proposed business model.  Blackhawk was formed a few days after this meeting.

83.     Fannie Mae subsequently approved new brokers who were using the services of Blackhawk.  Fannie Mae also continued to work with established brokers who hired Blackhawk to assist in the brokers' ongoing activities for Fannie Mae.

84.     REO brokers are expected to perform many tasks very quickly, but they do not know how many assignments they will receive each month from Fannie Mae. They must contract with experienced personnel and costly systems so that they are prepared to perform an extensive list of tasks immediately upon receipt of each Fannie Mae assignment.  Brokers must also be "assignment ready" with respect to the advancing of expenses for each Fannie Mae property with cash, lines of credit and/or loans.  These requirements impose significant practical and financial burdens upon many REO brokers.

85.     Blackhawk was created to address, minimize and solve many of the practical and financial burdens confronting Fannie Mae's REO brokers.

86.     In part, Blackhawk has provided the following services to Fannie Mae's REO brokers:

(a)     On-site training in the broker's office on process/procedures, broker price opinions and other needed areas of focus in the REO sales field;

(b)     Training in the field and at REO properties to demonstrate the process of preparing, managing and selling such properties;

(c)     Assistance with the substantial cash outlays associated with maintaining Fannie Mae properties until Fannie Mae reimburses the expenses and the properties are sold;

(d)     Back-office and administrative support relating to bills, expenses, expense reimbursement, invoicing, accounting, property preservation coordination and HOA assistance;  and

(e)     Document review and quality control review.

87.     During 2012, Blackhawk and Spinetto's other companies utilized the services of at least five (5) former Fannie Mae employees with excellent knowledge in the REO sales field, including a former Outsourcing Team Manager, a former REO Foreclosure Spec-V Credit officer, two former Sales Representatives, and Mark Woodling, a former Sales Manager for Fannie Mae in the auction area.  These former Fannie Mae employees have approximately 57 years of combined experience in the REO field and a total of 32 years of prior employment at Fannie Mae.

88.     During discussions with Spinetto, Fannie Mae has never questioned the qualifications of these former employees.  However, Fannie Mae has asked Spinetto about his

retention of each former Fannie Mae employee, and has expressed displeasure at the hiring of so many former Fannie Mae employees.

89.     During 2012, Blackhawk also used the services of licensed, qualified and highly regarded real estate brokers and agents.  Blackhawk's personnel included individuals who had been working for Fannie Mae in the REO sales field since 2008, including Spinetto.

90.     While using Blackhawk's services, REO brokers generally received favorable performance reviews from Fannie Mae during 2011 and 2012.

91.     While using Blackhawk's services, REO brokers frequently increased their inventory from Fannie Mae.  They regularly received additional monthly assignments of new properties from Fannie Mae.  Upon information and belief, Fannie Mae continued to assign properties to these REO brokers because these brokers, with the support of Blackhawk, provided reliable performance, consistent results, and favorable outcomes for Fannie Mae.

92.     When the REO Brokers were terminated, Fannie Mae never identified any performance-related concerns and, in fact, denied that the terminations were based upon any performance problems.

93.     In or before 2012, Fannie Mae frequently praised the work of Spinetto and encouraged him to train new participants in Fannie Mae's REO sales field.

94.     Blackhawk had written contracts with many REO brokers that identified the services to be provided and the compensation structure.

95.     All of Blackhawk's written contracts with REO brokers included a minimum five-year term and required the REO brokers to use Blackhawk's services with respect to each

assigned Fannie Mae REO property.  These contracts were *not* due to terminate in 2012, 2013 or 2014.

96.    Most of Blackhawk's contracts prohibited termination by the REO brokers.

97.    In or about October 10, 2012, Blackhawk provided Fannie Mae with a copy of its contract with a particular REO broker. Fannie Mae was advised in or about October of 2012 that Blackhawk had similar contracts with other REO brokers.

98.    Fannie Mae subsequently terminated all known brokers who were clients of Blackhawk, including the broker with the contract that Fannie Mae had received on October 10, 2012.

99.    Fannie Mae knew when it terminated the REO brokers in or about November of 2012 that Blackhawk had contracts with them.

100.    Fannie Mae knew that Blackhawk's existing contracts and business opportunities would be damaged and/or destroyed by the broker terminations.

101.    Upon information and belief, Fannie Mae terminated the REO brokers in order to eliminate Blackhawk's business activities relating to Fannie Mae's properties.

102.    Several REO brokers asked Fannie Mae if they could remain as brokers with Fannie Mae if they terminated Blackhawk or reduced Blackhawk's responsibilities.  Fannie Mae did not agree to these requests and terminated all of these brokers.

103.    Blackhawk asked Fannie Mae to identify which tasks brokers could outsource. Fannie Mae refused to answer this question.

### Fannie Mae's Improper and Bad Faith Activities

104.    Upon information and belief, Fannie's Mae's terminations of REO brokers were the last in a long series of malicious, bad faith, unjustified, conspiratorial and anti-competitive actions that were targeted at Blackhawk, Spinetto, and persons with whom they regularly conducted business.  After Spinetto became a very successful, confident and visible participant in Fannie Mae's REO sales operations with many strong relationships within the Fannie Mae hierarchy, certain personnel within Fannie Mae began a concerted effort to destroy Spinetto's REO business.

105.    Fannie Mae, by and through its agents, began a series of tortious, wrongful and defamatory actions against the Plaintiff in or about June of 2012.  Calvin Short ("Short"), Stephen Powell ("Powell") and Chris Kocks ("Kocks") of Fannie Mae participated in and initiated many of the first wrongful acts.   Without justification or excuse, they repeatedly made negative comments about Spinetto, Blackhawk and two brokerage companies that were owned (in part) by Spinetto.

### Calvin Short

106.    Short is a "Repair Specialist" at Fannie Mae.  In part, he reviews repair bids.  He pursues personal agendas against brokers and vendors who, in his view, are too successful.  Short often interjects himself into matters that are unrelated to his official duties.  Fannie Mae is fully aware of Short's inappropriate and unprofessional behavior and has permitted him to use his authority as a Fannie Mae employee in an abusive and vindictive manner.

107.    Short selectively applies, enforces and interprets the REO Sales Guide to meet his

own personal agendas.

108.    Upon information and belief, Short personally dislikes Spinetto.

109.    Upon information and belief, Short has undertaken a purposeful course of conduct that was intended to damage Spinetto and his companies, including Blackhawk.

110.    Upon information and belief, Short favors certain Service Agreement Markets ("SAM") contractors and tries to direct business to them.

111.    In or about 2012, Short commenced a campaign to damage Blackhawk and Spinetto.

112.    Between April of 2012 and December of 2012, Short made negative and false comments to numerous sales representatives at Fannie Mae about Spinetto and the businesses with which Spinetto is affiliated, including two brokerage firms and Blackhawk.

113.    In part, Short falsely stated and/or implied in 2012 that Spinetto's companies were inflating repair bids and/or improperly favoring particular SAM contractors.  These negative and false comments were made to Sales Representatives at Fannie Mae and to others.   Fannie Mae permitted such false accusations and knew or should have known that Short's baseless investigations and accusations were damaging Spinetto's companies.

114.    Fannie Mae never discovered any improper conduct in the repair field by Blackhawk or any of Spinetto's other companies.

115.    Yet, Short expressed great personal satisfaction at his efforts to get "the goods" on Spinetto.

116.    Upon information and belief, Short supports a subset of Fannie Mae vendors, and endeavors to promote the business of particular vendors at the direct expense of other vendors.

**Stephen Powell**

117.    Powell's tortious actions commenced in or about June of 2012, and corresponded with the departure of a Fannie Mae employee, Mark Woodling ("Woodling"). Woodling left Fannie Mae and started working as an independent contractor for Blackhawk on or about June 4, 2012.

118.    Powell has great personal animus toward Woodling. This animus arises from work-related disputes while Woodling was Powell's supervisor at Fannie Mae.

119.    Immediately after Woodling commenced work with Blackhawk, Powell began "investigating" Blackhawk with harassing and baseless inquiries.

120.    In June and/or July of 2012, Powell transmitted email(s) in which he inquired about "Blackhawk's role in the REO world." He was purportedly investigating Blackhawk's "business model." In July of 2012, Powell was also sending emailed inquiries to Fannie Mae employees about Spinetto and his business activities.

121.    Powell used his title of "Fraud Investigator IV" when he was communicating in writing with brokers who employed Blackhawk.

122.    Powell falsely asserted in multiple emails, dated August 2, 2012 and September 13, 2012, that he was "performing a quality assurance review" in connection with brokers who had hired Blackhawk. He repeatedly asked for commission disbursement forms from brokers who were using Blackhawk's services.

123.     Powell communicated with multiple personnel within Fannie Mae that he was conducting a "mortgage fraud" investigation into Blackhawk. Upon information and belief, Powell had no bona fide basis for requesting information from brokers and was abusing his position within Fannie Mae in an effort to pursue a personal grudge against Woodling.

124.     According to Fannie Mae's attorneys, Fannie Mae never found any "fraud" by the brokers or Blackhawk.

### Chris Kocks

125.     Kocks is a Director at Fannie Mae with oversight responsibilities in the REO field. In or about the summer of 2012, Kocks stated that Spinetto's REO activities were getting too big. Kocks expressed an intention to take Spinetto down. He verbalized this goal to many employees at Fannie Mae.

126.     On or about June 14, 2012, Blackhawk personnel conversed with staff at Fannie Mae, including Kocks, to provide accurate information about Blackhawk's services. Spinetto of Blackhawk had further conversations with Kocks in July and August of 2012. During these lengthy phone conversations, Kocks was not forthright or truthful.

127.     Despite Blackhawk's ongoing cooperation with Fannie Mae, Powell, Short, Kocks and Fannie Mae persisted in their efforts to destroy and malign Blackhawk.

128.     Commencing in June and July of 2012, Fannie Mae, by and through its personnel and agents, authorized and permitted the publication and dissemination of many defamatory and knowingly false factual statements about Blackhawk.

129.    On or about July 30, 2012 and/or July 31, 2012, Kocks, Sales Director at Fannie Mae, widely disseminated a defamatory email to at least six Fannie Mae directors, the Head of Outsourcing, and John Liszka of Fannie Mae that expressed repeated "concern" about Blackhawk's role.  Without limitation, the email stated:  "concerns have surfaced regarding the roll [sic] Blackhawk Consulting is playing in our business as they act in the capacity of a consultant to some of our brokers/agents... From the conversations I have had with many concerned Fannie Mae employees and with Blackhawk directly, there appear to be three main areas where the services Blackhawk offers are not consistent with the REO Sales Guide.... Organizationally we are not telling our brokers/agents whom they can conduct business with in areas not specifically covered by the REO Sales Guide.... I ask that as you come across instances where it appears Blackhawk may have touched a case you keep a watchful eye.... In addition, please share with me any other items of concern you may have or find regarding Blackhawk Consulting."

130.    This email quickly and predictably circulated to others, including at least three Managers within Fannie Mae's Outsourced AMP Department.  At the direction of a Fannie Mae employee, this email was circulated to all of the outsourcers, including, upon information and belief, Vendor Resource Management, Green River, 24 Asset Management, Chrisley Asset Management, Nationstar REO, NDS, Old Republic, Phoenix Asset Management, PMH, Equity Pointe, Atlas, and New Vista.  The email cast a false and negative light upon Blackhawk and included false statements of fact.  Fannie Mae knew or should have known that the email included false information and defamatory material.

131.    Blackhawk promptly advised Fannie Mae of the negative rumors and false statements that were emanating from Fannie Mae. Upon information and belief, Fannie Mae did not undertake any efforts to control or correct the false and improperly negative comments by Fannie Mae staff.

132.    Blackhawk also specifically advised Kocks that Powell was transmitting multiple written inquiries that were confrontational, pointed and damaging to Blackhawk's reputation. Blackhawk specifically advised Kocks of the personal animosity of Powell towards Woodling.

133.    John Liszka, a Vice President of Sales at Fannie Mae, also knew about Powell's animosity towards Woodling.

134.    On or about October 14, 2012, a sales meeting was called at Fannie Mae and Sales Representatives, Sales Managers and Sales Directors were sternly admonished for assigning their inventory of REO assets to particular brokers.  They were chastised harshly for showing an assignment preference for the better-performing brokers, many of whom used the services of Blackhawk.

135.    These Sales Representatives at Fannie Mae are rewarded financially for their successful disposition of assets and, yet, they were being instructed to assign assets to less qualified brokers. Fannie Mae's actions were inconsistent with the REO Sales Guide and with Fannie's Mae's established procedures.

136.    Fannie Mae repeatedly and purposely asserted to third parties and other personnel within Fannie Mae that Blackhawk was under investigation for, or guilty of, mortgage fraud and/or other misconduct, when there was no *bona fide* basis for any such assertions.  Upon

information and belief, these widely disseminated assertions were intended to harm Blackhawk and individuals who are associated with Blackhawk.

137.    While this investigation was ongoing, Fannie Mae personnel provided knowingly false and misleading information to Blackhawk regarding the nature and direction of the inquiry. During telephone calls in August of 2012, Kocks assured Spinetto that the investigation had identified "mild" and "pretty quickly remedied" problems. He said that there was a "market" for Blackhawk's services. He claimed to support Blackhawk's efforts to help "even out staffing for brokers." He said that he liked Spinetto, appreciated Spinetto's "entrepreneurial spirit" and that Blackhawk had hired "good people." He asserted that Fannie Mae did not have the "appetite" to tell brokers who they could not engage for services, and that Fannie Mae did not want to tell brokers who they can deal with.

138.    Kocks admitted that Fannie Mae might need to rewrite the REO Sales Guide if Fannie Mae chose to regulate the brokers' use of agents.

139.    During his telephone calls with Spinetto in August of 2012, Kocks made a knowingly false statement of fact to Spinetto by stating that nothing had been explicitly said or written that would put Blackhawk in a negative stance. In fact, Kocks already had personally circulated such a negative email a few days before the conversations.

### Other Malicious and Wrongful Conduct

140.    Fannie Mae refused to meet with Blackhawk personnel, despite repeated requests from Blackhawk for a meeting.

141.     Fannie Mae subsequently suspended all of the known brokers with whom Blackhawk worked.

142.     In or about October of 2012, John Liszka, a Vice President of Sales, wrote emails to brokers demanding copies of all agreements with "Jonathan Spinetto or Blackhawk Consulting, LLC" by the close of business.  He cited paragraph 17 of the Master Agreement. That paragraph was not applicable.

143.     In or about November of 2012, Fannie Mae terminated all of the known brokers with whom Blackhawk worked.  The brokers were terminated "without cause."

144.     Fannie Mae advised the terminated brokers that they could reapply as REO brokers.  Upon information and belief, Fannie Mae had no present intention of approving these brokers and misrepresented Fannie Mae's intentions in a scripted termination call.

145.     In December of 2012, Fannie Mae personnel, including Gina Justman, Sales Representative, continued to disseminate false and derogatory oral comments to REO brokers about Blackhawk.   Gina Justman told a broker that persons associated with Blackhawk had done something "improper" and that other brokers had been "fired" as a consequence.  However, Fannie Mae has consistently refused to identify any specific acts of alleged misconduct by Blackhawk or the terminated brokers.

**COUNT 1 – DEFAMATION (LIBEL AND SLANDER)**

146.     Plaintiff incorporates by reference all of the allegations in paragraphs 1 through 145 as if fully stated herein.

147.   Defendant, by and through several agents and employees, including but not limited to Kocks,  Powell, Short, and Gina Justman repeatedly wrote, published, and spoke statements that defamed Plaintiff and Plaintiff's employees and independent contractors.

148.   Defendant's defamatory statements included (but were not limited to) an email on July, 30, 2012 and/or July 31, 2012 from Kocks that stated the following:

> As you may or may not be aware concerns have surfaced regarding the roll [sic] Blackhawk Consulting is playing in our business as they act in the capacity of a consultant to some of our brokers/agent.  Specifically, we have seen evidence of Blackhawk working with brokers/agents in a variety of capacities across multiple geographies.
>
> From the conversations I have had with many concerned Fannie Mae employees and with Blackhawk directly there appear to be three main areas where the services Blackhawk offers are not consistent with the REO Sales Guide.  At a high level those areas are: a) utilities being in the name of the broker's/agent's company b) the BPOs being completed by our broker/agent and c) the Scope of Repairs being completed by our broker/agent. Shirley Mastenbrook was kind enough to put together the attached document with snap shots of the sales guide for our reference as concerns these specific topics.
>
> Organizationally we are not telling our brokers/agents whom they can conduct business with in areas not specifically covered by the REO Sales Guide. But we will call brokers/agents to task when they are in violation of the REO Sales Guide.  I ask that as you come across instances where it appears Blackhawk may have touched a case you keep a watchful eye.  If you find REO Sales Guide violations, have immediate and direct conversations with the broker/agent.  In addition, please share with me any other items of concern you may have or find regarding Blackhawk Consulting.
>
> Thank you and call with questions,
>
> Chris Kocks
>
> *FANNIE MAE*

149.   This communication included false statements of fact.  Blackhawk was not completing broker price opinions ("BPOs") for the broker/agents.  Fannie Mae knew or should have known that this statement was untrue.

150.   This emailed communication was also false with respect to the scope of repairs comment. Fannie Mae knew or should have known that Blackhawk's personnel were not completing the actual bids or conducting on site visits.  When written, the email was also untrue as to the assertion regarding utility accounts.

151.   This communication also depicted Plaintiff in a negative and false light.  Fannie Mae, by and through its many agents, was clearly blacklisting Blackhawk with repeatedly negative expressions of "concern" and factual misstatements.

152.   This communication was widely disseminated to personnel within Fannie Mae, outsourcers and others.

153.   Powell also repeatedly made false and negative statements about Blackhawk to many persons within the REO industry, as previously summarized in this Complaint.

154.   Upon information and belief, numerous managers, directors and in-house legal staff within Fannie Mae were aware of the repeatedly defamatory statements that Defendant's employees made with respect to Plaintiff, sanctioned such statements, and failed to correct or prevent the defamatory statements.

155.   Defendant's defamatory statements tended to injure Plaintiff, and did injure Plaintiff, in Plaintiff's field of services.  Defendant's defamatory statements impugned Plaintiff

and had the intended effect of depicting Plaintiff as a company with which brokers, vendors and others in the REO field should not do business.

156.    Defendant knowingly made the aforementioned false and defamatory statements about Plaintiff.   In the alternative, Defendant negligently made the aforementioned false and defamatory statements about Plaintiff.

157.    Defendant published these false and defamatory statements to sales representatives, brokers, vendors, Fannie Mae personnel, outsourcers and others, who reasonably understood these statements to be defamatory.

158.    Defendant acted with knowledge of the falsity of the statements and with the intent to harm Plaintiff's business contracts and opportunities in the REO field when publishing and stating these false and defamatory statements about the Plaintiff.

159.    As a result of the false and defamatory statements published and spoken by Defendant, the character and reputation of Plaintiff has been harmed, and its standing and reputation in the business community were impaired.

160.    As a direct and proximate result of the false and defamatory publications and statements, Plaintiff lost existing and future business, and thereby suffered a loss of prospective income which it would have earned in the real estate field.

WHEREFORE, Plaintiff hereby prays for and demands judgment in its favor and against Defendant **FEDERAL NATIONAL MORTGAGE ASSOCIATION** in the amount of **FIFTEEN MILLION DOLLARS ($15,000,000.00)** in compensatory damages, **FIFTEEN MILLION DOLLARS ($15,000,000.00)** in punitive damages, plus costs and interest.

## COUNT 2 – TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

161.    Plaintiff restates the allegations in paragraphs 1 through 160 as if fully set forth herein.

162.    Plaintiff had binding written contracts with numerous REO brokers.

163.    Those REO brokers provided services to Fannie Mae.  Many of these brokers had received superior performance reviews from Fannie Mae and regularly received new assignments from Fannie Mae.  These brokers had a reasonable expectation of future assignments and commissions from Fannie Mae.

164.    Fannie Mae knew that these REO brokers employed and paid Blackhawk for services.

165.    Fannie Mae had received and reviewed at least one written contract between Blackhawk and an REO broker and knew that Blackhawk had similar contracts with other brokers.

166.    Fannie Mae knew that Blackhawk's compensation was paid by the brokers after the brokers received payment from Fannie Mae.

167.    Fannie Mae knew that Blackhawk's contracts could not be terminated at will by the brokers.

168.    Fannie Mae purposefully, maliciously, wrongfully, and without justification terminated all of the Master Agreements with all known REO brokers who had hired Blackhawk.

169.    Upon information and belief, Fannie Mae's actions were intended to punish the brokers for using Blackhawk, to strip Blackhawk and the brokers of any compensation for work

that had already been performed, and to shut down all of Blackhawk's REO and other operations.

170.    Fannie Mae knew that its actions would interfere with Blackhawk's contracts and would damage Blackhawk. Fannie Mae acted in a discriminatory, improper, unjustified, defamatory, disparaging, libelous, and fraudulent manner, with the express purpose of harming Plaintiff.

171.    Blackhawk was damaged by Fannie Mae's wrongful and tortious conduct. Such damages include lost compensation for work performed for all of the terminated brokers. Those brokers had more than six hundred (600) assigned properties at the time of termination. Blackhawk had performed work on most, if not all, of these properties and expected payment for its work. Blackhawk's contracts with the brokers provided for such payment.

**WHEREFORE**, Plaintiff hereby prays for and demands judgment in its favor and against Defendant **FEDERAL NATIONAL MORTGAGE ASSOCIATION** in the amount of **FIFTEEN MILLION DOLLARS ($15,000,000.00)** in compensatory damages, plus costs and interest.

## COUNT 3 – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITIES

172.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 171 as if fully set forth herein.

173.    Defendant engaged in willful and intentional acts involving the Plaintiff, as set forth in the foregoing paragraphs of this Complaint.

174.    Defendant's conduct was calculated to cause damage to Plaintiff's existing and prospective business in the REO field and in the real estate business.

175.    Defendant's conduct was committed for an unlawful or improper purpose to cause such damage to Plaintiff, without justification.

176.    Plaintiff experienced actual damage as a direct and proximate result of Defendant's acts.

177.    Plaintiff had existing clients from whom it reasonably expected future compensation.  These clients have been terminated by Fannie Mae and, as a direct and intended consequence, Plaintiff has lost the opportunity to earn such future compensation.

178.    Plaintiff had created a valuable and expanding market for its services in the REO field.  It was entering into new contracts with brokers on a regular and reasonably predictable basis.

179.    Plaintiff has lost the opportunity to earn future compensation from these prospective clients due to Defendant's wrongful, improper, discriminatory, and unjustified policies and conduct.

**WHEREFORE**, Plaintiff hereby prays for and demands judgment in its favor and against Defendant **FEDERAL NATIONAL MORTGAGE ASSOCIATION** in the amount of **FIFTEEN MILLION DOLLARS ($15,000,000.00)** in compensatory damages, plus costs and interest.

## COUNT 4 – UNJUST ENRICHMENT

180.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 179 as if fully stated herein.

181. Plaintiff's relationship with Fannie Mae is not governed by an integrated and unambiguous contract.

182. Plaintiff conferred benefits to Fannie Mae in connection with the properties for which Fannie Mae has refused to compensate the terminated REO brokers.

183. Fannie Mae benefited from services provided by Plaintiff in connection with REO properties that were assigned to these REO brokers.

184. Fannie Mae was aware of and had knowledge of the benefits conferred by Plaintiff.

185. Fannie Mae accepted and retained the benefits of Plaintiff's services on REO properties.

186. It is inequitable for Fannie Mae to retain the benefits of Plaintiff's work and services without paying Plaintiff for the value thereof.

WHEREFORE, Plaintiff demands judgment against Defendant **FEDERAL NATIONAL MORTGAGE ASSOCIATION** in the amount of **FIFTEEN MILLION DOLLARS ($15,000,000.00)** in compensatory damages, plus costs and interest, and any other relief to which this Court finds Plaintiff entitled.

## COUNT 5 – PROMISSORY ESTOPPEL

187. Plaintiff incorporates by reference all of the allegations in paragraphs 1 through 186 as if fully set forth herein.

188. Fannie Mae promised to pay for the work performed by its brokers.

189.   Fannie Mae reasonably expected its promises to induce action by the assigned brokers and Plaintiff in reliance upon Fannie Mae's promise.

190.   Fannie Mae's promise induced actual and reasonable actions by Plaintiff.

191.   Plaintiff relied upon the promises and past practices of Fannie Mae with respect to the manner in which REO properties were handled by Fannie Mae, including the payment for services rendered.

192.   Plaintiff hired and paid staff for the purpose of servicing the needs of Fannie Mae.

193.   Plaintiff commenced and performed work on hundreds of properties with the reasonable expectation that Plaintiff would be compensated for said work.  Plaintiff and its personnel performed work on said properties over varying periods of time.  Some properties required many months of work.  Plaintiff invested and paid for hundreds of man-hours associated with the Fannie Mae properties that were assigned to REO brokers at the time of termination.

194.   Plaintiff was required to pay staff and incur expenses associated with these properties.

195.   Plaintiff's reliance upon Fannie Mae's promise of compensation was foreseeable and reasonable.

196.   Plaintiff has suffered a detriment as a result of Fannie Mae's refusal to honor its promises.

197.    Plaintiff's detriment can only be avoided by the enforcement of Fannie Mae's promise.

WHEREFORE, Plaintiff demands judgment against Defendant **FEDERAL NATIONAL MORTGAGE ASSOCIATION** in the amount of **FIFTEEN MILLION DOLLARS ($15,000,000.00)** in compensatory damages, plus costs and interest, and any other relief to which this Court finds Plaintiff entitled.

### COUNT 6 – QUANTUM MERUIT

198.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 197 as if fully set forth herein.

199.    Plaintiff rendered valuable services to Fannie Mae with the intention of receiving a fee for services rendered and accepted by Fannie Mae.

200.    Fannie Mae benefited from Plaintiff's services and knew that Plaintiff expected payment therefor.

201.    Fannie Mae has refused to pay for Plaintiff's services or to pay the brokers for Plaintiff's services.

202.    Plaintiff has been damaged by Defendant's conduct.

WHEREFORE, Plaintiff demands judgment against Defendant **FEDERAL NATIONAL MORTGAGE ASSOCIATION** in the amount of **FIFTEEN MILLION DOLLARS ($15,000,000.00)** in compensatory damages, plus costs and interest, and any other relief to which this Court finds Plaintiff entitled.

## COUNT 7 - VIRIGINA STATUTE – BUSINESS CONSPIRACY

203.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 202 as if fully set forth herein.

204.    Plaintiff is organized in the Commonwealth of Virginia and has its principal place of business in Virginia.

205.    Defendant violated Virginia Code § 18.2-499 ("Virginia's Business Conspiracy Statute").  That statute imposes liability upon two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever.

206.    Plaintiff has a private cause of action for civil damages, and trebled damages, under Virginia Code § 18.2-500.

207.    Plaintiff suffered damages as a direct and proximate result of Defendant's wrongful conduct in violation of Virginia's Business Conspiracy Statute.

208.    The conspirators, including but not limited to Short, Powell, Kocks and Fannie Mae, acted intentionally, purposefully, with legal malice and without lawful justification.

209.    Upon information and belief, the named conspirators also conspired with brokers, brokerage companies, and vendors (collectively "John Does") who sought to benefit from the termination of high-performing brokers in their communities.  Said John Does are reasonably expected to receive additional assignments and work from Fannie Mae, including properties and repair jobs that were previously assigned to the terminated brokers and to certain SAM contractors.

WHEREFORE, Plaintiff demands judgment against Defendant **FEDERAL NATIONAL MORTGAGE ASSOCIATION** in the amount of **FIFTEEN MILLION DOLLARS ($15,000,000.00)** in compensatory damages, plus trebled damages, costs attorneys' fees, interest, and any other relief to which this Court finds Plaintiff entitled.

### COUNT 8 – COMMON LAW CIVIL CONSPIRACY

210.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 209 as if fully set forth herein.

211.    Upon information and belief, Short, Powell, Kocks, Fannie Mae, and certain John Does (collectively "Conspirators") conspired to cause harm to Plaintiff and to certain Fannie Mae brokers.  They entered into an agreement and/or understanding to shut down Plaintiff's REO operations by and through defamatory comments, baseless investigations, the termination of brokers and other wrongful conduct.

212.  The Conspirators engaged in unlawful or tortious acts done in furtherance of their conspiracy and/or used unlawful or tortious means to accomplish an act not in itself illegal.

213.    The Conspirators caused actual legal damage to the Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendant **FEDERAL NATIONAL MORTGAGE ASSOCIATION** in the amount of **FIFTEEN MILLION DOLLARS ($15,000,000.00)** in compensatory damages, plus costs and interest, and any other relief to which this Court finds Plaintiff entitled.

LAW OFFICE OF
LAURIE B. HORVITZ, LLC

By: _____  [Laurie B. Horvitz]
      Laurie B. Horvitz #384702
      4520 East West Highway, Suite 700
      Bethesda, MD   20814
      (301) 961-6429
      Counsel for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all issues triable by jury in this case.

_____
Laurie B. Horvitz

- 37 -